## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **STEPHANIE L. HUNSAKER,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:05cv00027 |
| | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **JO ANNE B. BARNHART**, | ) | |
| **Commissioner of Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

In this social security case, I affirm the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

Plaintiff, Stephanie L. Hunsaker, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge upon transfer pursuant to the consent of the parties under 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 2:05-cv-00027-PMS   Document 14   Filed 12/02/05   Page 1 of 23   Pageid#: 47

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Hunsaker protectively filed her applications for DIB and SSI on October 9, 2003, alleging disability as of August 15, 2002, based on post-traumatic stress disorder, ("PTSD"), depression, back pain, right knee pain and migraine headaches. (Record, ("R."), 45-49, 58, 99, 134, 244-45.) Hunsaker's claims were denied both initially and on reconsideration. (R. at 30-32, 35, 36-38, 248-50.) Hunsaker requested a hearing before an administrative law judge, ("ALJ"), (R. at 39), and this hearing was held on December 30, 2004, at which Hunsaker was represented by counsel. (R. at 251-82.)

By decision dated March 4, 2005, the ALJ denied Hunsaker's claims. (R. at 15-22.) The ALJ found that Hunsaker met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 20.) The ALJ found that Hunsaker had not engaged in substantial gainful activity since August 15, 2002. (R. at 20.) The ALJ also found that Hunsaker had severe impairments, namely an adjustment disorder with mixed anxiety/depressed mood and borderline intellectual functioning, but he found that Hunsaker did not have an impairment or combination

-2-

of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ further found that Hunsaker's allegations regarding her limitations were not totally credible. (R. at 21.) The ALJ concluded that Hunsaker retained the residual functional capacity to perform simple, unskilled work at all levels of exertion that did not expose her to high stress and that required only limited interaction with the public. (R. at 21.) Therefore, the ALJ found that Hunsaker was unable to perform her past relevant work. (R. at 21.) Based on Hunsaker's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that Hunsaker could perform jobs existing in significant numbers in the national economy, including those of an office cleaner, a maid, a telemarketer, a laundry worker, a hand packer, an inspector and an assembler. (R. at 21.) Thus, the ALJ found that Hunsaker was not under a disability as defined by the Act and was not eligible for benefits. (R. at 21-22.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

After the ALJ issued this decision, Hunsaker pursued her administrative appeals, (R. at 10-11), but the Appeals Council denied her request for review. (R. at 7-9.) Hunsaker then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2005). The case is before this court on the Commissioner's motion for summary judgment filed November 22, 2005.

## II. Facts

Hunsaker was born in 1967, (R. at 45, 244), which classifies her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2005). She has an eleventh-

grade education and some cosmetology training, thereafter obtaining her apprentice license.  (R. at 64, 254-55.)  Hunsaker has past relevant work experience as a cashier, a machine operator and an assistant manager in a department store.  (R. at 59.)

At her hearing, Hunsaker testified that she last worked in a department store in August 2002.  (R. at 255-56.)  She stated that she began working in the electronics department as a stock clerk and performing some sales duties, but was later moved into a position as a cashier.  (R. at 256.)  However, Hunsaker testified that she could not perform the job as a cashier because it required her to be around too many people, which made her "real nervous" and made her experience panic attacks.  (R. at 257.)  Hunsaker stated that she quit after her request to be moved back into the electronics department was denied.  (R. at 259.)  She testified that these problems had worsened since the time she quit working.  (R. at 259.)  Hunsaker stated that she also had worked as an inspector in an automobile parts factory, but quit that job to take care of her sick grandmother.  (R. at 259-60.)  She noted that if her grandmother had not become ill, she probably would still be working there.  (R. at 261.)  She further testified that she had worked as a cashier in grocery stores and gas stations and had gone through training to be an assistant manager at a retail store before it went out of business.  (R. at 260-61.)  However, Hunsaker later testified that she doubted her physical or mental ability to return to any of her previous work.  (R. at 261.)

Hunsaker testified that she could not leave her house without breaking down into tears, and she noted that the thought made her break into red splotches and throw up.  (R. at 262.)  She stated that she saw a counselor on one occasion before the counselor moved to a different location.  (R. at 273.)  She stated that, although she had

-4-

tried to see other counselors, she could not afford to do so.  (R. at 273.)

Hunsaker further testified that she experienced difficulties with her back and knees, especially the right one.  (R. at 262.)  She stated that she experienced daily headaches and four or five migraines each month associated with sensitivity to light and sound, nausea, blurred vision and numbness of the face.  (R. at 263.)  Hunsaker testified that the migraines lasted for approximately a day and a half and required her to lie down in a quiet, dark room.  (R. at 263.)  Hunsaker stated that the migraines had begun only since she quit working, but she noted that she experienced chronic headaches when she last worked.  (R. at 264-65.)  She testified that she had been prescribed Imitrex.  (R. at 264.)  Hunsaker testified that her physician had told her that these headaches were caused by stress.  (R. at 265.)  She also stated that she periodically experienced neck pain, but noted that she was not being treated for it.  (R. at 266.)  Hunsaker testified that she experienced shoulder pain, which she attributed to arthritis.  (R. at 266-67.)  She noted that her back pain was easily triggered and could keep her down for a couple of weeks at a time.  (R. at 267.)  Hunsaker testified that performing household chores affected her back.  (R. at 267.)  She further stated that her right knee would "lock" or "pop out," causing pain and swelling.  (R. at 267.)  However, she stated that these problems had not been treated because she began experiencing them only a couple of years previously.  (R. at 267.)  Hunsaker further described aches and pains in her feet.  (R. at 267.)

Hunsaker testified that she suffered a work-related injury to her back when she worked in the automobile parts factory, for which she received chiropractic treatment.  (R. at 268.)  She estimated that she could lift a gallon of milk.  (R. at 268-69.)  She

-5-

further testified that she had difficulty bending. (R. at 269.) Hunsaker stated that her back would go out at least three times per month, lasting at least four days at a time. (R. at 269.) Nonetheless, Hunsaker testified that she performed household chores approximately twice a month. (R. at 271.) She stated that she did not prepare her own meals, with the exception of making sandwiches, and that she was able to take care of her personal needs when she had the energy. (R. at 271.) Hunsaker testified that she watched television, but that reading gave her headaches. (R. at 271.) She stated that she did not participate in any social activities outside of the home, but that she talked with relatives on the telephone and through e-mail. (R. at 271-72.)

Donna Sturgill, Hunsaker's aunt, also was present and testified at Hunsaker's hearing. (R. at 275-78.) Sturgill testified that she had known Hunsaker for about 30 years. (R. at 275.) She stated that Hunsaker would not go anywhere because she was afraid. (R. at 276.) Sturgill testified that she spoke with Hunsaker on a nearly daily basis and visited her occasionally. (R. at 276.) She stated that Hunsaker was not able to do much around the house because she stayed tired and that she did not socialize. (R. at 276-77.) Sturgill opined that Hunsaker was too depressed to return to work. (R. at 277.) She stated that Hunsaker did not drive very often, noting that she had not seen her drive "in years." (R. at 277.) Sturgill testified that she had encouraged Hunsaker to obtain mental health treatment, but that she could not afford to do so. (R. at 278.)

Hunsaker submitted a letter from Rosemarie Meade, a friend, for the ALJ's review. (R. at 141-42.) Meade stated that she had known Hunsaker for four and one-half years and had watched both her mental and physical conditions deteriorate. (R.

-6-

at 141-42.)  Among other things, she stated that she feared that Hunsaker might try to hurt herself, but that she could not afford mental health counseling.  (R. at 141.) Meade further stated that the thought of leaving her house made Hunsaker physically ill.  (R. at 141.)

Norman Hankins, a vocational expert, also was present and testified at Hunsaker's hearing.  (R. at 279-81.)  Hankins classified Hunsaker's past work as a department store cashier, a stock clerk and a cashier and deli worker in a grocery store as light[1] and unskilled.  (R. at 279.)  He classified her work in the automobile parts factory as medium[2] and semiskilled.  (R. at 279.)  Hankins classified Hunsaker's work as a general clerk in a retail store as light and semiskilled.  (R. at 279.)

Hankins was asked to assume a hypothetical individual of Hunsaker's age, education and work history who had no exertional limitations, but who could perform only simple, unskilled, low-stress jobs that would not require regular interaction with the general public.  (R. at 279-80.)  Hankins testified that such an individual could perform the jobs of an office cleaner, a maid, a kitchen worker, a laundry worker, a hand packer, an inspector and an assembler, all existing in significant numbers in the national economy.  (R. at 280.)  Hankins was next asked to assume the same individual, but whose ability to concentrate and persist was greater than moderately

_____

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds.  If someone can perform light work, she also can perform sedentary work.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2005).

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds.  If someone can perform medium work, she also can perform light and sedentary work.  *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2005).

impaired. (R. at 280.) Hankins testified that such an individual could not perform any jobs. (R. at 280.) Hankins was then asked to consider an individual who experienced four to five migraine headaches per month resulting in an inability to function for a day at a time. (R. at 280-81.) Hankins again testified that such an individual would be unable to work. (R. at 281.) Finally, Hankins testified that an individual with the restrictions testified to by Hunsaker would be unable to work. (R. at 281.)

In rendering his decision, the ALJ reviewed records from Dr. Gerardo Lopez, M.D.; Appalachian Regional Healthcare, ("ARH"); Howard Leizer, Ph.D., a state agency psychologist; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Shane McDougal, M.D.; R. J. Milan Jr., Ph.D., a state agency psychologist; and Amalia C. "Christy" Collins, a licensed clinical social worker.

The record reveals that Hunsaker saw Dr. Gerardo Lopez, M.D., from January 2001 through October 2003, with a history of uterine fibroids associated with vaginal bleeding. (R. at 143-64, 237-39.) On January 11, 2001, Hunsaker was diagnosed with multiple uterine fibroids and a myomectomy was scheduled for later that month. (R. at 156.) She was prescribed Lorcet and Celebrex. (R. at 156.) On January 18, 2001, Hunsaker presented to Appalachian Regional Healthcare, ("ARH"), with complaints associated with multiple uterine fibroids. (R. at 165.) On January 24, 2001, she underwent an exploratory laparotomy, a multiple myomectomy,[3] a right adnexectomy[4]

---

[3]A myomectomy refers to the surgical removal of a fibroid. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY, ("Dorland's"), 906, 1091 (27th ed. 1988).

[4]An adnexectomy refers to the excision of the ovaries, the uterine tubes and ligaments of the uterus. *See* Dorland's at 31.

and lysis of adhesions. (R. at 170-71.) The results of this procedure revealed uterine fibroids and widespread endometriosis including multiple cysts of the right ovary. (R. at 162, 172.) Hunsaker was discharged on January 26, 2001. (R. at 169.)

On January 31, 2001, Hunsaker presented to the emergency department at ARH with complaints of neck and back pain after being involved in a motor vehicle accident the previous day. (R. at 166-67.) She was diagnosed with cervical and lumbar spine strain. (R. at 167.) X-rays of the cervical and lumbar spines revealed only mild scoliosis and lumbar spinal curvature. (R. at 168.)

On February 6, 2001, Hunsaker complained of increased pelvic pain. (R. at 154.) She reported no bleeding at that time. (R. at 154.) She was placed on antibiotics. (R. at 154.) On July 24, 2001, a pap smear yielded normal results. (R. at 159.) On July 24, 2001, Hunsaker was again diagnosed with possible fibroids, but noted decreased pain. (R. at 151, 160.) On August 9, 2001, Hunsaker underwent a total hysterectomy. (R. at 158, 177-79.) She was diagnosed with ovarian and tubal endometriosis, chronic cervitis, disordered proliferative endometrium, adenomyosis, two intramural leiomyomata and serosal endometriosis. (R. at 158.) Hunsaker was discharged on August 12, 2001, and was prescribed Tylox. (R. at 176.) On September 20, 2001, Hunsaker was placed on Zoloft. (R. at 148.) On April 12, 2002, she complained of decreased libido, hot flashes and night sweats and was placed on hormone replacement therapy. (R. at 146.) A March 13, 2003, pap smear was again normal. (R. at 157.) On September 26, 2003, Hunsaker presented with complaints of vaginal bleeding and was diagnosed with atrophic vaginitis. (R. at 143.)

On May 14, 2003, Hunsaker presented to the emergency department at ARH with complaints of a migraine headache associated with nausea, vomiting and sensitivity to light for the previous two days. (R. at 190-94.) It was noted that Hunsaker was alert and oriented and had no motor or sensory deficits. (R. at 193.) She was diagnosed with a headache, was prescribed ibuprofen and was released. (R. at 193-94.)

On December 16, 2003, Howard Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), concluding that Hunsaker suffered from no medically determinable impairment. (R. at 195-209.) Leizer noted no evidence of psychiatric hospitalizations, general hospitalizations with psychiatric treatment, outpatient psychiatric treatment or treating physician reports regarding any mental health treatment. (R. at 209.) He concluded that Hunsaker's allegations were not credible. (R. at 209.)

Hunsaker saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on December 23, 2003, for a psychological evaluation. (R. at 210-14.) Lanthorn noted that Hunsaker was fully oriented and displayed no signs of delusional thinking or psychotic processes. (R. at 210.) Lanthorn opined that Hunsaker was functioning in the borderline range of intelligence. (R. at 211.) Hunsaker reported that Dr. Lopez had diagnosed her with PTSD approximately two years previously based on her suffering from endometriosis for several years, having experienced four miscarriages and having undergone an eventual hysterectomy without ever having children. (R. at 211.) Hunsaker reported that she had never sought mental health treatment, was then currently taking no prescription medications and did not have a physician. (R. at 212.)

-10-

She further reported an inability to be around other people, and she noted that she became easily irritated. (R. at 212.) Hunsaker noted difficulty concentrating and experiencing "real intense headaches." (R. at 212.) She stated that she had difficulty leaving her house and socializing with others. (R. at 212.) She described herself as "nervous and moody," and noted that when forced to be around people, she would "actually get sick." (R. at 212.)

Hunsaker reported crying all the time, having little energy and virtually no libido. (R. at 212.) She stated that she was able to do laundry, make meals for herself and grocery shop if someone took her. (R. at 212.) Hunsaker stated that she did not attend church and socialized primarily with her boyfriend of four years, her mother and occasionally a nephew. (R. at 212-13.) She described her short-term memory as "terrible." (R. at 213.) Lanthorn stated that, although Hunsaker reported difficulties with anxiety and depression, depression appeared to be her primary difficulty. (R. at 213.) Lanthorn diagnosed Hunsaker with an adjustment disorder with mixed anxiety and depressed mood, borderline intellectual functioning and a then-current Global Assessment of Functioning, ("GAF"), score of 65 to 70.[5] (R. at 213.) He opined that Hunsaker was competent to manage her own funds. (R. at 213.) Lanthorn further opined that, despite Hunsaker's short-term memory complaints, no such difficulties were displayed during the examination. (R. at 213.) He further opined that, despite Hunsaker's reports of suffering from PTSD, he did not think that she met the criteria

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 61 to 70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

for PTSD and was not involved in an actual traumatic event that was beyond a comparatively normal event experienced by many women during their lives. (R. at 213.) Although Lanthorn noted signs of anxiety and depression, he found it interesting that Hunsaker had never sought the help of a mental health professional. (R. at 213-14.) Lanthorn strongly recommended that Hunsaker do so for both psychotherapy and a psychiatric evaluation to assess whether psychotropic medications would be appropriate. (R. at 214.) He concluded that Hunsaker was experiencing mild to moderate limitations in her adaptability skills. (R. at 214.)

On March 11, 2004, Hunsaker saw Amalia C. "Christy" Collins, a licensed clinical social worker at Bon Secours St. Mary's Behavioral Health. (R. at 243.) Collins diagnosed major depression, severe, rule out PTSD and a then-current GAF score of 57.[6] (R. at 243.)

On March 26, 2004, Hunsaker saw Dr. Shane McDougal, M.D., at the referral of Collins to assess the initiation of antidepressants. (R. at 215.) Hunsaker denied any suicidal or homicidal ideations. (R. at 215.) Dr. McDougal noted that Hunsaker was very tearful at times and exhibited classic symptoms of major depression. (R. at 215.) Hunsaker was diagnosed with major depression and was given samples of Lexapro. (R. at 215.) She was advised to continue with counseling. (R. at 215.)

On May 7, 2004, R. J. Milan Jr., Ph.D., a state agency psychologist, completed a PRTF, indicating that Hunsaker suffered from an affective disorder and mental

---

[6]A GAF score of 51 to 60 indicates "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning. ..." DSM-IV at 32.

retardation, but noting that a residual functional capacity assessment was necessary. (R. at 216-30.) Milan found that Hunsaker was only mildly restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 226.)

The same day, Milan also completed a Mental Residual Functional Capacity Assessment, finding that Hunsaker was moderately limited in her abilities to understand, remember and carry out detailed instructions, to maintain attention and concentration and to accept instructions and respond appropriately to criticism from supervisors. (R. at 231-33.) In all other areas of functioning, Hunsaker was deemed to be not significantly limited, with the exception of the ability to ask simple questions or request assistance, for which Milan found no evidence of limitation. (R. at 231-32.) Milan concluded that Hunsaker was able to understand, remember and carry out simple work instructions under ordinary supervision, demonstrating no more than occasional difficulties concentrating for extended periods and containing her emotionality. (R. at 233.) He noted that Hunsaker could "persist at work routines, interact appropriately with others in a work setting, and adapt self-sufficiently, sustaining simple work routines on a regular, ongoing basis." (R. at 233.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).

-13-

This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2005). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2005).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated March 4, 2005, the ALJ denied Hunsaker's claims. (R. at 15-22.) The ALJ found that Hunsaker had severe impairments, namely an adjustment disorder with mixed anxiety/depressed mood and borderline intellectual functioning, but he found that Hunsaker did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 20.) The ALJ concluded that Hunsaker retained the residual functional capacity to perform simple, unskilled work at all levels of exertion that did

-14-

not expose her to high stress and that required only limited interaction with the public. (R. at 21.) Therefore, the ALJ found that Hunsaker was unable to perform her past relevant work. (R. at 21.) Based on Hunsaker's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that Hunsaker could perform jobs existing in significant numbers in the national economy, including those of an office cleaner, a maid, a telemarketer, a laundry worker, a hand packer, an inspector and an assembler. (R. at 21.) Thus, the ALJ found that Hunsaker was not under a disability as defined by the Act and was not eligible for benefits. (R. at 21-22.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2005).

In her brief, Hunsaker argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Memorandum Of Law, ("Plaintiff's Brief"), at 8-9.) Specifically, Hunsaker argues that she suffers from disabling mental and physical impairments. (Plaintiff's Brief at 3-5.) Hunsaker further argues that the hypothetical question relied upon by the ALJ in determining that she could perform jobs existing in significant numbers in the national economy, was incomplete. (Plaintiff's Brief at 5.) Finally, Hunsaker argues that the ALJ erred by failing to discuss the testimony and written evidence of lay witnesses submitted to the ALJ in making his disability determination. (Plaintiff's Brief at 5.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial

evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d),416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Hunsaker first argues that the ALJ erred by failing to find that she suffered from disabling physical and mental impairments. (Plaintiff's Brief at 3-5.) I will first address Hunsaker's alleged physical impairments before turning to her mental impairments. Hunsaker alleges back pain, chronic gynecological difficulties, migraine headaches and knee problems. However, the record does not reveal that any of these ailments rise to the level of a severe impairment, thereby precluding any contention that she suffered from a disabling physical impairment. The Social Security regulations define a "nonsevere" impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2005). Basic work activities

-16-

include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2005). The Fourth Circuit held in *Evans v. Heckler*, that "'"[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."'" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

I find that substantial evidence supports the ALJ's failure to find that Hunsaker suffered from a severe physical impairment, thereby also precluding her contention that she suffered from a disabling physical impairment. The record reveals that Hunsaker has suffered from some gynecological difficulties, ultimately resulting in a total hysterectomy. Nonetheless, no restrictions were ever imposed as a result of these difficulties. Likewise, despite Hunsaker's allegations of back pain, the record reveals that x-rays taken on January 31, 2001, after Hunsaker was involved in a motor vehicle accident, showed only mild scoliosis and lumbar spinal curvature. (R. at 167-68.) It appears that Hunsaker made no other complaints or sought no other treatment for back pain. Regarding her claims of suffering four to five migraine headaches per month leaving her incapacitated for a day at a time, the only evidence contained in the record is an emergency department visit on May 14, 2003. (R. at 190-94.) At that time, Hunsaker complained of a migraine associated with nausea, vomiting and sensitivity to light for the previous two days, but it was noted that she was alert and

oriented and had no motor or sensory deficits. (R. at 193.) She was prescribed ibuprofen and was released home. (R. at 193-94.) Moreover, although Hunsaker testified at her hearing that she had been prescribed Imitrex for the treatment of migraines, there is no supporting documentation contained in the record.

For all of these reasons, I find that substantial evidence supports the ALJ"s failure to find that Hunsaker suffered from a severe or disabling physical impairment.

Next, I find that substantial evidence supports the ALJ's finding that Hunsaker suffered from severe mental impairments, namely an adjustment disorder with mixed anxiety/depressed mood and borderline intellectual functioning. However, I further find that substantial evidence supports the ALJ's failure to find that such mental impairments were disabling. Hunsaker testified at her hearing that she quit her job at the department store only after her request to be transferred back to the electronics department from her job as a cashier was denied. (R. at 259.) Moreover, she stated that she would not have quit her job in the automobile parts factory if her grandmother had not become ill. (R. at 261.) Thus, Hunsaker herself has admitted an ability to perform substantial gainful employment. Furthermore, despite her severe mental impairments, the evidence does not show that Hunsaker is so significantly limited in her work-related mental abilities so as to preclude the performance of substantial gainful activity. For instance, in December 2003, state agency psychologist Leizer concluded that Hunsaker had no medically determinable impairment. (R. at 195-209.) Later that month, psychologist Lanthorn assessed Hunsaker's GAF score as 65 to 70, indicating only mild symptoms. (R. at 213.) He concluded that she experienced mild to moderate limitations in her adaptability skills. (R. at 214.) Lanthorn further noted

that, despite Hunsaker's reported diagnosis of PTSD, he did not believe that she met the criteria therefor. (R. at 213.) In March 2004, Collins assessed Hunsaker's GAF score as 57, indicating moderate symptoms. (R. at 243.) Later that month, Dr. McDougal diagnosed major depression and gave her samples of Lexapro. (R. at 215.) However, he placed no restrictions on Hunsaker at that time.

In May 2004, state agency psychologist Milan found that Hunsaker was only mildly restricted in her activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced no episodes of decompensation. (R. at 226.) Milan further found that Hunsaker was moderately limited in her abilities to understand, remember and carry out detailed instructions, to maintain attention and concentration and to accept instructions and respond appropriately to criticism from supervisors. (R. at 231-32.) In all other areas of functioning, Hunsaker was deemed to be not significantly limited, with the exception of the ability to ask simple questions or request assistance, for which Milan found no evidence of limitation. (R. at 231-32.) Importantly, as the Commissioner correctly notes in her brief, Milan opined that Hunsaker could "persist at work routines, interact appropriately with others in a work setting, and adapt self-sufficiently, sustaining simple work routines on a regular, ongoing basis." (R. at 233.) The only other evidence contained in the record pertinent to Hunsaker's alleged mental impairments is a treatment note from Collins, a social worker, and one from Dr. McDougal, neither of whom placed any work-related limitations on Hunsaker's mental abilities. Finally, I note that, despite Hunsaker's allegations that she was unable to leave her house due to panic attacks, on a November 2003 Daily Activities Questionnaire, she stated that she went out for a daily run. (R. at 108.)

For all of these reasons, I find that substantial evidence supports the ALJ's finding that, while Hunsaker suffered from severe mental impairments, they were not disabling in nature.

Hunsaker also argues that the ALJ erred by failing to consider the testimony of her aunt and the letter submitted to the ALJ by Meade. (Plaintiff's Brief at 5.) I find that this argument is without merit. The Fourth Circuit has held that where it is not possible to reach a disability determination based on expert medical opinion and evidence, subjective testimony by lay witnesses may be entitled to great weight where it is uncontradicted in the record. *See Laws*, 368 F.2d at 644 (citing *Underwood v. Ribicoff*, 298 F.2d 850, 852 (4th Cir. 1962)). Here, for the reasons already stated, the medical evidence contained in the record is sufficient to support the ALJ's disability determination relevant to Hunsaker's mental impairments. Thus, the testimony and evidence submitted by the lay witnesses is not necessary to the ALJ's disability determination. Moreover, as the Commissioner notes in her brief, the ALJ is not required to accept statements that are not supported by the medical evidence. *See* 20 C.F.R. §§ 404.1508, 416.908 (providing that a claimant's physical or mental impairment be established by "medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms.") Finally, the Fifth Circuit, in *Harrell v. Bowen*, 862 F.2d 471, 482 (5th Cir. 1988) (citing *Fitzsimmons v. Matthews*, 647 F.2d 862, 864 (8th Cir. 1981)), held that "[s]upporting, objective findings are important to the disability determination because the observations of an individual, particularly a lay person, may be colored by sympathy for the affected relative or friend and influenced by that person's exaggeration of h[er] limitation."

-20-

For all of these reasons, I find that the ALJ did not err by failing to expressly discuss the testimony and written evidence of the lay witnesses in making his disability determination.

Next, Hunsaker argues that the ALJ erred by relying upon an incomplete hypothetical question posed to the vocational expert in reaching his disability determination. (Plaintiff's Brief at 5.) It is well-settled that "[i]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all ... evidence in the record ... and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). For the following reasons, I find that the hypothetical question upon which the ALJ relied in making his disability determination fairly set out all of Hunsaker's impairments as supported by the record and, therefore, constitutes substantial evidence to support the ALJ's conclusion that Hunsaker could perform jobs existing in significant numbers in the national economy. The vocational expert testified that an individual of Hunsaker's age, education and work history who had no exertional limitations, but who could perform only simple, unskilled, low-stress jobs that would not require regular interaction with the public could perform the jobs of an office cleaner, a maid, a kitchen worker, a laundry worker, a hand packer, an inspector and an assembler, all existing in significant numbers in the national economy. (R. at 21, 280.) I find that this hypothetical encompasses all of Hunsaker's limitations as supported by the record on appeal. Although Hunsaker notes that the vocational expert testified that an individual whose ability to concentrate and persist was greater than moderately impaired could not work, none of the psychologists placed such a restriction on Hunsaker. Instead, as

previously noted, Leizer concluded that Hunsaker had no medically determinable impairment and, thus, imposed no restrictions. (R. at 195-209.) Lanthorn found that Hunsaker was experiencing only mild to moderate limitations in her adaptability skills. (R. at 214.) Milan concluded that Hunsaker was moderately limited in her ability to maintain attention and concentration. (R. at 231.) Thus, I find that this hypothetical simply is not supported by the medical evidence of record. Next, Hunsaker notes in her brief that the ALJ testified that an individual who experienced four to five migraine headaches per month resulting in an inability to function for a day at a time would not be able to work. Again, I find that such limitations are not supported by the medical evidence. The only evidence in the record relevant to Hunsaker's alleged migraines is one visit to the emergency room in May 2003, at which time she was alert and oriented and exhibited no motor or sensory deficits. (R. at 193-94.) She was prescribed ibuprofen and released home. (R. at 193-94.) There is no other mention of migraine headaches contained in the record on appeal. Finally, Hunsaker notes that the vocational expert testified that an individual with the limitations testified to by Hunsaker would not be able to work. However, I find, as did the majority of the medical sources and the ALJ, that Hunsaker's subjective allegations are not totally credible. Despite Hunsaker's allegations of disability, the evidence of record supports no more than some moderate limitations on her work-related mental abilities. Moreover, as previously discussed, Hunsaker has admitted that if her grandmother had not become ill, she probably would still be working at the automobile parts factory. (R. at 261.) Likewise, she testified not that she could not work any position at the department store, but that she quit only after her request to be transferred from the cashier position back to the electronics department was denied. (R. at 259.) Thus, Hunsaker has admitted that she believes that she retains the ability

to work certain jobs.

For all of these reasons, I find that the ALJ relied on a proper hypothetical encompassing all of Hunsaker's limitations as supported by the record in finding that she was not disabled.

*IV. Conclusion*

For the foregoing reasons, the Commissioner's motion for summary judgment will be granted, and the Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:    This 2nd day of December 2005.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE